IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

VERONICA NORMAN,            )
                            )
           Plaintiff,       )
                            )
    vs.                     )          2:04cv1185
                            )          Electronic Filing
JO ANNE B. BARNHART,        )
Commissioner of Social Security, )
                            )
           Defendant.       )

## MEMORANDUM JUDGMENT ORDER

AND NOW, this 7th day of October, 2005, upon due consideration of the parties' cross motions for summary judgment pursuant to plaintiff's request for review of the decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for disability insurance benefits under Title II of the Social Security Act ("Act"), IT IS ORDERED that the Commissioner's motion for summary judgment (Doc. No. 8) be, and the same hereby is, **denied** and plaintiff's motion for summary judgment (Doc. No. 6) be, and the same hereby is, **granted**. Accordingly, judgment will be entered in favor of plaintiff and against the Commissioner by separate order in accordance with Federal Rule of Civil Procedure 58 remanding the matter with direction to grant benefits consistent with an onset date of October 3, 2001.

The Commissioner's findings and conclusions leading to a determination that a claimant is not "disabled" must be supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971); Stunkard v. Secretary of Health and Human Services, 841 F.2d 57, 59 (3d Cir. 1988). The task of this court in reviewing the decision below is "to determine whether there is substantial evidence on the record to support the ALJ's decision." Burnett v. Commissioner of Social Security, 220 F.3d 112, 118 (3d Cir. 2000). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Morales v. Aphel, 225 F.3d 310, 316 (3d Cir. 2000)(quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir.

1999)).

As the fact finder, the administrative law judge ("ALJ") has an obligation to weight all the facts and evidence of record and may accept or reject any evidence if the ALJ explains the reasons for doing so. Plummer, 186 F.3d at 429. This includes crediting or discounting a claimant's complaints of pain and/or subjective description of the limitations caused by his or her impairments. Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983); Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). And where the findings of fact leading to the decision of the Commissioner are supported by substantial evidence, a reviewing court is bound by those findings, even if it would have decided the inquiry differently. Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2000). But where a review of the entire record reveals that the Commissioner's decision is not supported by substantial evidence, the court has an obligation to reverse the decision and remand with direction to grant benefits or conduct further proceedings. Podedworny v. Harris, 745 F.2d 210, 221 (3d Cir. 1984). A remand with direction to grant benefits is appropriate only when substantial evidence on the record as a whole indicates the claimant is disabled and entitled to benefits. Id. at 221-22.

Plaintiff seeks review of the ALJ's June 17, 2003, decision denying her application for benefits pursuant to a finding that although plaintiff's ability to engage in substantial gainful activity is restricted by limitations resulting from the severe impairments of cervical and lumbar spine pain syndrome and an inner ear disorder, plaintiff retained the residual functional capacity to perform a limited range of work that was consistent with "pushing, pulling, lifting, and/or carrying up to 10 pounds occasionally; sitting for three hours and standing and/or walking about three hours each during an eight-hour workday with the option to sit or stand at her election; occasional stooping, kneeling, crouching, and/or crawling; frequent reaching, handling, fingering, feeling; with avoidance of sudden head movements." R. 19-20. A vocational expert indicated plaintiff could resume her past relevant work as a secretary or data entry clerk as normally performed in the national economy. The Appeals Council denied plaintiff's request for review

and the instant action followed.

Plaintiff was 41 years of age at the time the ALJ issued his decision. She completed high school and vocational training at the ICM School of Business. R. 116. Plaintiff virtually had a steady work history from 1978 into 2001. R. 101, 119-126. Plaintiff lives with her husband and two sons. R. 160.

Plaintiff alleged she became unable to work on a full time basis and thus disabled on April 9, 2001, due to a cervical sprain, thoracic impingement syndrome, lumbar sprain and a vestibular disorder, all of which resulted from a motor vehicle accident on that date. R. 147. After the accident plaintiff was treated for a variety of symptoms that included, neck, left shoulder, and lumbar pain with radiating numbness, loss of hearing, ringing and pressure in the left ear, dizziness and loss of balance, headaches and general fatigue and weakness. R. 109-115. Plaintiff had a steady history of medical treatment following the motor vehicle accident that initially was limited to conservative treatment but ultimately involved shoulder impingement surgery and two inner ear operations. R. 308, 413, 417. While plaintiff experienced improvement in her symptoms at times during the course of treatment, they returned after a short period of time and she was unable to obtain long term relief during the period of time under review.

On April 9, 2001, plaintiff was driving her vehicle and had stopped at a merge ramp on a major thoroughfare. She was hit from behind and experienced whiplash type trauma to the shoulder, neck and head. Part of this trauma was produced by the restraint from the seat belt followed by plaintiff striking her head and neck on the headrest. R. 195. Plaintiff sought treatment in the emergency room the next day for neck pain and headaches. R. 195. Within a few days she sought treatment from her primary care physician, Vincent F. Petraglia, D.O., who had been treating plaintiff since at least April of 1997. R. 184, 195. Plaintiff reported experiencing constant headaches, neck pain and left shoulder pain as well as blurred vision. R. 195. Plaintiff had been unable to return to work since April 9, 2001. R. 195. Dr. Petraglia

prescribed pain medication, a muscle relaxer and physical therapy. R. 195. On April 26, 2001, examination continued to produce findings consistent with a probable thoracic sprain. R. 196.

Over the next several months Dr. Petraglia continued to monitor plaintiff's condition on a bi-weekly or monthly basis. Plaintiff continued to experience pain in the cervical and thoracic regions of her spine that radiated into the left shoulder and arm, as well as significant bouts of dizziness. R. 203. Based on radiographic testing Dr. Petraglia diagnosed plaintiff as suffering from cervical and thoracic sprain with left upper extremity radiculopathy and a mild disc protrusion at C5-6 with a slight flattening of the spinal cord at that level. R. 203, 282, 293. Throughout this time Dr. Petraglia continued to treat plaintiff conservatively and completed a number of forms indicating she remained unable to return to work but would likely be able to return to work in a month or so. R. 234, 236, 240, 243. Plaintiff continued to undergo an extensive course of physical therapy. R. 245-264, 273-277.

After plaintiff continued to experience ear pain, tinnitus, and dizziness, Dr. Petraglia referred plaintiff to an otologist, Moises A. Arriaga, M.D., who specializes in otologic surgery and vestibular disorders. Dr. Arriaga treated plaintiff for otalgia, tinnitus and dizziness. R. 319. An audiogram revealed asymmetry, left fullness, and occasional episodic piercing tinnitus, especially after leaning forward. R. 304. Physical examination was remarkably positive for Fukuda stepping to the right and plaintiff became markedly off balance when attempting to make a quick turn to the left. R. 304. Her symptoms persisted after initial conservative medical management of these conditions. By October 3, 2001, Dr. Arriaga formed the impression that plaintiff was suffering from a perilymphatic fistula on the left side, which subsequently was confirmed by vestibular testing. R. 304-306. Given the history of vertigo after the accident and the unsuccessful attempts to control this condition through conservative management, Dr. Arriaga diagnosed plaintiff as suffering from a left perilymphatic fistula and recommended surgical repair, with the understanding that it would not likely improve her hearing or eliminate her tinnitus, but would provide fixed vestibular function so that plaintiff could regain her balance

through balance exercises. R. 308. On October 25, 2001, Dr. Arriaga performed left middle ear exploration with micro surgery, tympanolysis, and repair of oval and round window fistulas with tragal cartilage graph. R. 308.

Plaintiff experienced initial improvement after the inner ear surgery. R. 314. But within two month, she began to notice the recurrence of otalgia and her imbalance worsened as the day progressed and after exposure to sudden noises. R. 314. Dr. Arriaga diagnosed post-traumatic disequilibrium and hearing loss with fistula and possible post-traumatic hydrops and post-traumatic labyrinthine concussion. R. 314. She continued to treat plaintiff with balance exercises, klonopin and dyazide. R. 314. Plaintiff continued to experience post-traumatic disequilibrium and dizziness in the weeks that followed. R. 318. Dr. Arriaga acknowledged that her symptoms suggested the possibility that additional surgery might be necessary, but she wanted to try to manage plaintiff's impairment conservatively if at all possible. R. 318.

On January 8, 2002, Dr. Arriaga authored a letter to the claims representative handling medical coverage from the motor vehicle accident. R. 319. After summarizing plaintiffs symptoms and history of treatment, Dr. Arriaga indicated plaintiff would be unable to return to work for the next month because of her ongoing symptoms and recommended that if she required additional certification of off work status, plaintiff be treated by a occupational medicine specialist, Dr. Daniel Nackley, who had been very attentive to patients with otologic needs. She gave a guarded prognosis at that juncture and was uncertain as to when plaintiff would be able to return to work. R. 319.

Dr. Arriaga also updated Dr. Petraglia on plaintiff's condition on January 8, 2002. She reported that plaintiff continued to experience disequilibrium with principle complaints of pain and tinnitus on the left side and increased sensitivity to sound. She prescribed a new course of treatment with neurotin, but advised that if symptoms progressed plaintiff may require vascular decompression surgery. R. 318.

Plaintiff reported improvement in February of 2002 with the use of neurontin. R. 322. Dr. Arriaga recommended that plaintiff continue her medication regime and balance exercises. R. 322. By April 5, 2002, plaintiff had begun noticing increased symptoms, along with increased symptoms in her upper cervical spine and posterior neck region. R. 328. Dr. Arriaga further reported that plaintiff was experiencing some temporomandibular joint problems. She advised Dr. Petraglia to refer plaintiff for an oral surgery evaluation for this symptom and recommended plaintiff consult Dr. Nackley with regard to her ability to return to the workforce. R. 328. She observed that plaintiff continued to experience ear pain with non-specific disequilibrium. R. 328.

In May of 2002, Dr. Arriaga advised plaintiff that matters pertaining to plaintiff's ability to work were best handled by Dr. Nackley, who was an expert in occupational medicine. R. 330. She further advised that while plaintiff did have some subtle abnormality in her test results indicating a difficulty in maintaining balance, many patients with plaintiff's symptoms were able to maintain adequate balance to at least function in a sedentary job. For this reason, Dr. Arriaga had referred plaintiff to Dr. Nackley to assist plaintiff with her disability/work issues. Because plaintiff's inner ear testing at that point in time was almost entirely normal, she recommended plaintiff continue with balance exercises and use ear drops as well as pursue treatment for TMJ dysfunction. R. 330.

By September 30, 2002, plaintiff was experiencing progressive left-sided tinnitus and hearing loss. R. 430. Dr. Arriaga again elected to treat the matter conservatively with a series of transtymapanic dexamethasone treatments as well as drops for ear pain. R. 430. Plaintiff experienced only temporary improvement from this treatment and had become very sensitive to noise and motion by January of 2003. R. 428. She continued to feel constant pressure on the left side and there was hearing loss consistent with hydrops. A fistula test was subjectively positive and a suggestion of nystagmus with positive pressure was present. R. 428. Dr. Arriaga formed the impression that plaintiff had left post-traumatic hydrops with history of perilymphatic fistula

and ongoing eustachian tube disfunction. On February 13, 2003, Dr. Arraiga performed left endolymphatic mastoid sac decompression, perilymphatic fistula exploration and myringotomy with tube insertion and a left repair oval and round window fistula with tympanolysis. R. 422-425. After the operation Dr. Arriaga diagnosed plaintiff with left post-traumatic dizziness with perilymphatic fistula and endolymphatic hydrops as well as eustachian tube dysfunction and otalgia. R. 422. She advised Dr. Petraglia that her operative findings revealed a fistula and were positive for Meniere's disease. R. 425.

Plaintiff also continued to experience shoulder pain and difficulty with her left shoulder in 2002. Plaintiff had experienced prior difficulty with her left shoulder that had been treated successfully in 1996. R. 278. On July 7, 2002, Dr. Michael Levin, M.D., performed an anterior stabilization of the left shoulder. R. 403, 413. Thereafter, he prescribed physical therapy in order to improve plaintiff's flexion and abduction of the left shoulder. R. 403. By January of 2003 plaintiff reported improvement with her shoulder and only modest limitation of motion with extension and external rotation. R. 418.

Plaintiff came under the care of Dr. Nackley, who was board certified in occupational medicine, on May 9, 2002, based on a referral from Dr. Arriaga. R. 351. Dr. Nackley reviewed plaintiff's medical history and conducted a physical examination, which revealed mild axial cervical spine tenderness and lumbosacral spine tenderness in both sacroiliac joints. He noted musculoskeletal symptoms, including left neck and shoulder discomfort as well as low back pain. R. 352. On June 11, 2002, plaintiff advised Dr. Nackley of the potential for exploratory arthroscopic surgery on her left shoulder by Dr. Levin and the increased symptoms with her left ear. R. 353. At that juncture Dr. Nackley reported that he could objectively support a claim for temporary total disability benefits through February 28, 2002, based on the ongoing need for therapy in an effort to restore plaintiff's balance. R. 353.

After reviewing plaintiff's medical history and records and becoming familiar with her, Dr. Nackley began to complete status reports on plaintiff's ability to return to work. On July 25,

2002, Dr. Nackley advised that plaintiff had undergone surgery on her left shoulder secondary to the motor vehicle accident, a prior oval window rupture and repair, TMJ treatment and was suffering from depression, all of which precluded plaintiff from returning to work for at least four weeks. R. 354. On August 22, 2002, Dr. Nackly reaffirmed plaintiff's inability to return to work for at least three months. R. 408. His assessment was based on TMJ syndrome, recent surgery to the left shoulder, prior oval window rupture and repair and depression. R. 408. At that point plaintiff had started to decrease her use of vicadin and increase her use of celebrex. R. 408. In a follow-up assessment completed three months later on November 13, 2002, Dr. Nackley indicated plaintiff could return to full time sedentary work with the restrictions of sitting, standing and walking no more than thirty minutes at a time, no climbing or crawling and only minimal bending and other forms of postural maneuvering. R. 410.

Six weeks later, in January of 2003, plaintiff had experience increased vestibular symptoms to the degree that required further surgery under the supervision of Dr. Arriaga. R. 422-426, 428. Dr. Nackley declared plaintiff totally disabled as of January 27, 2003, due to the symptoms from plaintiff's vestibular disorder as well as her musculoskeletal pain. He noted plaintiff was scheduled for endolymphatic mastoid decompression surgery on February 13, 2003, and opined that plaintiff would be able to return to part-time work no earlier than June 15, 2003, as a result. R. 413.

Following the surgery plaintiff returned for treatment and assessment under the supervision of Dr. Nackley on April 7, 2003. At that juncture Dr. Nackley prescribed a gradual increase in part-time work commencing on May 1, 2003, with a goal of obtaining full time status by June 16, 2003. R. 434. Dr. Nackley indicated plaintiff was unable to return to work through April 30, 2003, and imposed the following restriction on plaintiff's return to part-time work as of May 1, 2003: no more than fifteen minutes of standing, walking or sitting at one time; no carrying of any weight and only occasional lifting of up to ten pounds; no climbing or crawling

and only occasional postural maneuvering. R. 434.[1]

Plaintiff appeared at the hearing before the ALJ on April 29, 2003, and the ALJ issued his opinion on June 17, 2003.

Against the above backdrop the ALJ denied plaintiff's application for benefits on the ground that the assessments and opinions of the treating and consulting physicians were not compatable with the objective medical findings contained in the record and were internally inconsistent. Specifically, the ALJ noted that Dr. Nackley reported in June of 2002 that plaintiff was only suffering from total disability through February 28, 2002, and then the very next month, "without specification," Dr. Nackley reported that plaintiff was unable to return to work and continued the same assessment in August of 2002. Similarly, without adequate justification in the ALJ's view, Dr. Nackey again reported that plaintiff could return to work in November 2002. The ALJ failed to reference Dr. Nackley's assessments in January of 2003 and thereafter.

The ALJ also discounted the assessments of Dr. Petraglia and restricted review of Dr. Petraglia's medical assessments to a December 27, 2001, report indicating plaintiff could sit, stand or walk for one hour each per day and drive for one hour a day, reading the report as indicating that plaintiff was capable of performing basic sedentary exertional work with a sit/stand option. The ALJ further drew on "the evidence" of plaintiff's activities of daily living to conclude that plaintiff retained the residual functional capacity set forth above.

Plaintiff contends the ALJ erred by failing to address highly relevant and uncontroverted evidence from plaintiff's various treating physicians and improperly assigned minimal probative value to the assessments of the treating physicians that were taken into account. Plaintiff

---

[1] In a June 2, 2003, report that was not available to the ALJ, Dr. Nackley continued the above restrictions for an additional six weeks, limiting plaintiff to seven hour days, three days a week. R. 433. The assessment was based on plaintiff's vestibular disorder. R. 433. This report was made part of the record before the Appeals Council, but under established Third Circuit precedent it cannot be considered in determining whether the ALJ's findings and conclusions were supported by substantial evidence. Accordingly, the court has limited its consideration of Dr. Nackley's opinions and assessments to those issued through April 7, 2003.

contends that rather being "internally inconsistent," Dr. Nackley's numerous opinions reflect plaintiff's deteriorating condition and her inability to sustain full time work. In addition, plaintiff maintains that the ALJ dismissed the import of the treating physician's assessments and opinions based upon his own lay assessment of the medical evidence. Furthermore, plaintiff maintains that the ALJ failed to interpret properly Dr. Petraglia's December 27, 2001, assessment and failed to submit several established and unrefuted limitations to the vocational expert. The government contends the ALJ's findings and assessments are supported by substantial evidence.

The record lacks substantial evidence to support the ALJ's findings and conclusions. First, the ALJ failed to accord proper weight to the opinions and assessments of the treating physicians. He failed to consider important and critical information in their reports and assessments, and improperly interpreted the reports and assessments he did acknowledge. In addition, the record contained virtually no evidence to support his determination that plaintiff's activities of daily living were inconsistent with or suggested an ability to engage in full time substantial gainful activity. Finally, the record did not support his assessment of plaintiff's testimony pertaining to the limitations produced by her multiple impairments.

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)); see also Allen v. Bowen, 881 F.2d 37, 41 (3d Cir. 1989); Podedworney v. Harris, 745 F.2d 210, 217-18 (3d Cir. 1984). And reports from consulting physicians who have examined the claimant and rendered assessments on conditions within their respective area of expertise are to be given appropriate evidentiary weight, which will vary based on the circumstance and the other medical evidence presented. Gordils v. Secretary of Health and Human Services, 921 F.3d 327, 328 (1st Cir. 1990) (citing Rodriguez v. Secretary of Health and Human Services, 647 F.2d 218, 223 (1st Cir. 1981) (weight to be afforded a consulting/examining

physician's report "will vary with the circumstances, including the nature of the illness and the information provided the expert."). For example, where the consulting/examining physician's report constitutes the only probative medical evidence on the condition in question, it may be entitled to great or even controlling weight. See Reid v. Chater, 71 F.3d 372, 374 (10th Cir. 1995) (examining physician's report accorded significant weight where it was only medical assessment on point and corroborated by other evidence). Similarly, examining physician's reports that rest on objective clinical test results may be entitled to significant or controlling weight. See Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).

    The ALJ failed to give proper weight to the assessments of plaintiff's primary care physician, Dr. Petraglia. Dr. Petraglia began treating plaintiff well before the motor vehicle accident on April 9, 2001, and quickly became familiar with her symptoms and condition following the accident. He coordinated her treatment with various specialists after preliminary conservative treatment failed to produce satisfactory results. He was familiar with the symptoms that ultimately lead to the diagnoses of a vestibular disorder and Meniere's disease. He was familiar with the symptoms and treatment of plaintiff for cervical and low back chronic pain syndromes and provided plaintiff with pain medication for these conditions after taking into account the various reports of the consulting and examining experts. He also was familiar with plaintiff's complaints of shoulder impairment, which ultimately proved to warrant stabilization surgery on July 7, 2002, leading to marked improvement with this impairment after rehabilitation and physical therapy following that surgery. Based on his intimate familiarity with plaintiff's condition, symptoms, test results and the assessments by the consulting physicians, he consistently indicated plaintiff was unable to return to work due either to dizziness and a balance disorder or physical limitations as a result of chronic pain. While Dr. Petraglia did believe that plaintiff would only be temporarily disabled in the early months following the accident, by December of 2001 he was reporting that plaintiff continued to suffer from cervical and lumbosacral strain, a perilymphatic fistular repair, back pain, ear pressure and stiffness of the

11

back and neck with spasms of the cervical spine, and decreased range of motion and strength. R. 265. At that juncture he believed plaintiff was unable to meet the demands of a full work day and remained unable to return to her prior work as a secretary and data entry clerk. R. 265-268. This assessment was based on plaintiff's first inner ear surgery and the ongoing need to recover fully from her vestibular disorders before returning to work. R. 255, 268. As noted by Dr. Nackley, therapy toward full recovery from this condition continued through February of 2002. R. 353.

The ALJ also improperly interpreted the treatment records from Dr. Nackley. Plaintiff enjoyed a brief period of improvement in February and March of 2002, but began to complain of recurring vestibular symptoms by April of 2002. Dr. Nackley first examined plaintiff on May 9, 2002, and concluded after examination and a review of her records that she was recovering from oval window rupture repair surgery and vestibular symptoms and would be able to return to work in June of 2002. He did not, however, render an inconsistent assessment of plaintiff's ability to return to work one month later in July of 2002. To the contrary, Dr. Nackley was well aware that plaintiff underwent shoulder surgery on July 7, 2002. R. 413, 354, 408-410. He specifically designated plaintiff's inability to return to work as commencing on July 7, 2002, when he rendered his assessment of plaintiff's physical abilities on July 27, 2002. On August 22, 2002, he continued plaintiff's disabled status through November 13, 2002, at which time he released plaintiff to full time sedentary work with significant physical limitations. R. 408-410.

There was also nothing inconsistent about his assessments a little over one month later that again recognized plaintiff's inability to return to the work force. In January of 2003, Dr. Nackley became aware of plaintiff's need for a second inner ear surgery and again declared her unable to return to work in light of her balance disorder, shoulder injury, increased symptoms of fatigue and the need for and scheduled endolymphatic mastoid sac decompression surgery and myringotomy tube replacement on February 13, 2003. R. 415. That surgery resulted in operative findings of a fistula and the presence of Meniere's disease. R. 425. His assessment in April of

2003 was that plaintiff remained disabled through that time and would not be able to return to full time work until at least June 15, 2003. R. 434.

Contrary to the ALJ's assessment, there was nothing inconsistent about Dr. Nackley's opinions and assessments concerning plaintiff's ability to work. While he did conclude that plaintiff's vestibular disorder did not preclude her from working in June of 2002, he also acknowledged that her July 7, 2002, shoulder surgery, followed by extensive rehabilitation and physical therapy precluded plaintiff from returning to work until November of 2002. Of course, the shoulder impingement release surgery and the physical therapy that followed provided more than the needed "clinical findings and test results" to support this assessment. Dr. Nackley likewise concluded that plaintiff's need for a second inner ear surgery rendered her totally disabled after the increase in symptoms prior to January of 2003 necessitated the scheduling of that surgery. Based on ongoing assessments he recognized that plaintiff remained disabled from full time employment through at least June 15, 2003. R. 434. Of course the need for endolymphatic mastoid sac decompression surgery and myringotomy tube replacement, followed by post operative findings of a second fistula and the presence of Meneire's disease and the need for recovery and rehabilitation after the surgery, provided more than the objective clinical and medical findings needed to support Dr. Nackley's assessment.

The ALJ's failure to read the record comprehensively and observe the critical, unrefuted clinical findings, diagnoses and treatment records supporting Dr. Nackley's ongoing assessments was clear error and consequently the record lacked substantial evidence to support the ALJ's interpretation of Dr. Nackley's assessments of plaintiff's ability to do work related activities as well.

Moreover, a comprehensive review of the record reveals virtually no medical evidence to support the ALJ's residual functional capacity assessment. Dr. Petraglia was clear in his December 27, 2001, assessment that plaintiff lacked the ability to meet the demands of work activities at any time during an eight hour work day. R. 390. At that juncture plaintiff still was

13

recovering from her first ear surgery, which precluded substantial gainful activity in itself, and Dr. Petraglia opined that plaintiff could not otherwise meet the demands of substantial gainful activity due to the combined limitations from cervical and lumbosacral strain and her recovery from perlymphatic fistular repair surgery.

The medical evidence makes clear that plaintiff was disabled from all forms of substantial gainful activity from October 25, 2001, through February 28, 2002; July 7, 2002, through November 13, 2002; and January 13, 2003, through at least June 15, 2003. In short, a board certified physician in occupational medicine recognized plaintiff was disabled from all forms of work activity for at least thirteen out of nineteen consecutive months. During this time plaintiff's long term primary care physician likewise continued to recognize the debilitating effects from plaintiff's multiple severe impairments.

Other than a few interim notes that recorded some improvement through new forms of conservative treatment, there was no medical evidence suggesting plaintiff's symptoms and limitations were sufficiently under control to permit full time substantial gainful activity. Because there virtually was no evidence to the contrary, the ALJ was not free to ignore the entire body of consistent medical opinions and assessments by the treating and consulting physicians and draw adverse inferences having no substantial support. Morales, 225 F.3d at 318 (Of course, as a general matter an "ALJ cannot, as he did here, disregard [the import of the medical evidence] based on his own amorphous impressions, gleaned from the record, and from his evaluations of the claimant's credibility.") (quoting Kent v. Schweiker, 710 F.2d 110, 115 (3d Cir. 1982)). The ALJ likewise was not free to rely on a few isolated and selective excepts from the medical evidence to inform his assessment of plaintiff's residual functional capacity. See Kent, 710 F.2d at 114 (A single piece of evidence is not substantial if the Commissioner fails to resolve conflicts created by evidence, or if it is not evidence but mere conclusion.); Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981) ("Substantial evidence can be considered as supporting evidence only in relationship to all the other evidence in the record.").

The record also fails to contain substantial evidence to support the ALJ's assessment of plaintiff's credibility. The Act recognizes that under certain circumstances pain in itself may be disabling:

> [a]n individual's statement as to pain or other symptoms shall alone not be conclusive evidence of disability ...; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that result from anatomical, physiological or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under disability.

42 U.S.C. § 423 (d)(5)(A); Green v. Schweiker, 749 F.2d 1066 (3d Cir. 1984). The United States Court of Appeals for the Third Circuit has set forth a four-prong standard to be used by district courts when reviewing assessments of the Commissioner subjective pain: (1) subjective complaints of pain are to be seriously considered, even where not fully confirmed by objective medical evidence; (2) subjective pain may support a claim for disability benefits and may be disabling; (3) when such complaints are supported by medical evidence, they should be given great weight; and finally, (4) where the claimant's testimony as to pain is reasonably supported by medical evidence, the ALJ may not discount the pain without contrary medical evidence. Ferguson v. Schweiker, 765 F.2d 31 (3d Cir. 1985).

In the months immediately following the accident as well as in the months between plaintiff's first and second inner ear surgery, plaintiff continued to complain of significant pain and dizziness. While plaintiff's treating physicians first formed the impression that plaintiff's symptoms could be managed conservatively, testing ultimately revealed the need for further major surgery and the presence of a serious inner ear disorder. The same can be said about plaintiff's complaints of shoulder pain. While testing was inconclusive or demonstrated only

15

minor abnormalities, surgery covered a muscle tear and after several months of physical therapy plaintiff's shoulder pain subsided. R. 41, 45, 402-403.

Similarly, while there was a myofacial pain component to plaintiff's complaints and it appears that she may have been more sensitive to pain and discomfort than the average individual, there was no basis in the record to discredit plaintiff and disregard her testimony. Plaintiff's reports and accounts concerning her pain and the limitations caused by her multiple impairments were consistent and corroborated throughout the record. No treating or consulting physician who examined plaintiff ever suggested or implied that her complaints were without a correlating medical condition that could be expected to cause such pain and limitations. In fact, plaintiff's subjective complaints proved to be quite consistent with the ultimate diagnoses of her vestibular disorder and shoulder impairment. Furthermore, no physician ever suggested that plaintiff was malingering, exaggerating or over emphasizing the symptoms produced by her multiple impairments. Finally, plaintiff diligently pursued all forms of prescribed treatment.

Because there were medical bases for plaintiff's complaints of pain and reported limitations and the treating sources did not doubt the existence of these symptoms, the ALJ erred in failing to accord proper weight to this aspect of the record. See Stewart v. Sullivan, 881 F.2d 740 (9th Cir. 1989) (it is error to reject consistent evidence of excess pain on the ground that is not supported by objective medical findings where there is medical evidence to support the existence of some pain); Ferguson v. Schweiker, 765 F.2d 31 (3d Cir. 1985) (where claimant's testimony as to pain reasonably is supported by medical evidence, the ALJ may not discount the pain without contrary medical evidence; and where the complaints are supported by medical evidence, they are to be given great weight).

Moreover, plaintiff had a substantial and steady work history. It is well-settled that testimony regarding physical capacities and limitations from an individual with a continuous work record is entitled to substantial credibility. See Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979). In addition, subjective testimony regarding limitations on the ability to

16

engage in work-related activity is entitled to great weight where it is supported by and consistent with the medical evidence of record. Plaintiff had a work history that covered virtually twenty-one years of service. The vast majority of plaintiff's medical records were produced by her persistent attempts to overcome the injuries and degenerative health conditions she was faced with after the accident and regain the ability to perform her prior employment.

While the medical evidence in itself could be interpreted as identifying conditions that normally would be only temporary impairments not expected to last twelve months, plaintiff's consistent complaints, which were repeatedly verified after time, made clear that the multiple limitations from her impairments were not sufficiently under control at any time between October 3, 2001, when she was first diagnosed with a serious inner ear disorder, and June 15, 2003, when she was expected to recover from her second inner ear surgery (at the earliest). During this entire time plaintiff suffered from a vestibular disorder that produced disabling symptoms that returned very shortly after her first inner ear surgery and continued to impair her ability to do work-related activities. She also suffered from persistent pain and limitations resulting from a shoulder injury during much of this time as well as the residuals of cervical and lumbar strain. Plaintiff's subjective complaints ultimately uncovered the need for three corrective surgeries during this time.

Finally, there literally was no evidence which suggested plaintiff engaged in any activities of daily living or social functioning that were inconsistent with the pain and limitations she described. The record consistently reflected plaintiff's inability to engage in the activities of daily living beyond the most basic forms of personal hygiene and light housework. Because there virtually was no evidence to the contrary, the ALJ was not free to ignore the entire body of consistent evidence and draw adverse inferences having no substantial support. See Walton v. Halter, 243 F.3d 703, 709-10 (3$^d$ Cir. 2001) (ALJ may not ignore evidence and draw adverse inference having no substantial support in the record); Burnett, 220 F.3d at 122 ("an ALJ may not make speculative conclusions without any supporting evidence").

The Act describes disability as the inability to engage in substantial gainful activity by reason of a physical or mental impairment that can be expected to last for a continuous period of at least twelve months. The ability to engage in substantial gainful employment means more than the ability to do certain of the physical and mental acts required on the job; the claimant must be able to sustain the physical and mental demands of work-related activities throughout continuous attendance in a regular work week. Dobrowolsky v. Califano, 606 F.2d 403, 408 (3rd Cir. 1979). The question thus is not whether a claimant can perform activities consistent with substantial gainful activity on any particular day, but whether the claimant has the ability to engage in work activities on a systematic and sustained basis. Plaintiff had the burden of making out a prima facia case that she was disabled within in the meaning of the Act. Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980); Livingston v. Califano, 614 F.2d 342, 345 (3d Cir. 1980); 20 C.F.R. § 404.1512(a). This burden generally is met where the record clearly substantiates a claimant's subjective claim that he or she has an impairment which prevents the claimant from engaging in substantial gainful activity. Rossi v. Califano, 602 F.2d 55 (3d Cir. 1979). The substantial evidence of record supports only the conclusion that plaintiff could not engage in such activity as of October 3, 2001, when Dr. Arriaga recognized that plaintiff was required to undergo her first inner ear surgery. The medical and other evidence of record further supported only the view that the symptoms produced by plaintiff's multiple impairments and the procedures undertaken to treat them continued to render plaintiff disabled from all forms of substantial work activity from that point in time through at least June 15, 2003. R. 434. Accordingly, to the extent the ALJ's findings and conclusions reflected a determination that plaintiff was not disabled during this time they were not supported by substantial evidence. As a result plaintiff's motion for summary judgment must be granted and the matter will be remanded to the Commissioner with direction to grant benefits consistent with an onset date of October 3, 2001, with disability continuing

thereafter until at least June 15, 2003.

                                                              _____
                                                              David Stewart Cercone
                                                              United States District Judge


cc:   Charles T. Pankow, Esquire
      Suite 402
      955 Liberty Avenue
      Pittsburgh, PA 15222

      Megan Farrel, AUSA